IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MARLENE SMITH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil Action No. 09-182 |
| | ) |
| COMMISSIONER OF SOCIAL | ) |
| SECURITY, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

## I.  INTRODUCTION

Plaintiff, Marlene Smith, seeks judicial review of a
decision of defendant, Commissioner of Social Security ("the
Commissioner"), denying her application for supplemental security
income ("SSI") under Title XVI of the Social Security Act, 42
U.S.C. §§ 1381-1383f.[1]  Presently before the Court are the
parties' cross-motions for summary judgment pursuant to Rule 56
of the Federal Rules of Civil Procedure.  For the reasons set
forth below, Plaintiff's motion for summary judgment in which she
seeks a remand of this case for further consideration will be
granted, and the Commissioner's cross-motion for summary judgment
will be denied.

---

[1]The Court has jurisdiction of this appeal under 42 U.S.C.
§ 1383(c)(3) (incorporating 42 U.S.C. § 405(g)), which provides
that an individual may obtain judicial review of any final
decision of the Commissioner by bringing a civil action in the
district court of the United States for the judicial district in
which the individual resides.

## II.   **Background**

Plaintiff filed an application for SSI on August 2, 2007 (with a protective filing date of July 16, 2007), alleging disability beginning January 1, 1990. (R. 48-51). Following the denial of Plaintiff's SSI application by the reviewing State agency, she requested a hearing before an Administrative Law Judge ("ALJ"). At the hearing, which was held on June 23, 2008, Plaintiff, who was represented by counsel, her daughter and a vocational expert ("VE") testified. (R. 290-321).

On September 16, 2008, the ALJ issued a decision denying Plaintiff's application for SSI based on her conclusion that Plaintiff retained the residual functional capacity ("RFC") to perform work existing in significant numbers in the national economy.[2]  (R. 12-22). Plaintiff requested review of the ALJ's decision; however, the Appeals Council denied the request on January 2, 2009.  (R. 4-6, 8).  This appeal followed.[3]

---

[2]RFC is the most a disability claimant can still do despite his or her limitations. Hartranft v. Apfel, 181 F.3d 358, 359 n. 1 (3d Cir.1999)(citing 20 C.F.R. § 404.1545(a)).

[3]With respect to Plaintiff's alleged onset date of disability, Plaintiff claims that she developed disabling fibromyalgia immediately after the birth of her second child in 1990 due to complications during the delivery.  (R. 64).  The relevant time period for this appeal, however, begins July 16, 2007, the date on which Plaintiff protectively filed her application for SSI, and September 16, 2008, the date of the ALJ's adverse decision.  See 20 C.F.R. § 416.335.

The Court's review of the Commissioner's decision is limited
to determining whether the decision is supported by substantial
evidence, which has been described as "such relevant evidence as
a reasonable mind might accept as adequate to support a
conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971).
It consists of something more than a mere scintilla, but
something less than a preponderance.  Dobrowolsky v. Califano,
606 F.2d 403, 406 (3d Cir.1979).  Even if the Court would have
decided the case differently, it must accord deference to the
Commissioner and affirm the findings and decision if supported by
substantial evidence.  Monsour Medical Center v. Heckler, 806
F.2d 1185, 1190-91 (3d Cir.1986).

## III.  **Facts**

Plaintiff's date of birth is March 10, 1959.[4]  (R. 48).
With respect to education, Plaintiff graduated from high school
in June 1977.  (R. 72).  Between 1977 and 1984, when she quit
working to care for her first child who was born in 1983,[5]
Plaintiff worked in the areas of food service and newspaper

---

[4]Plaintiff was 48 years old when she filed her application
for SSI and 49 years old at the time of the hearing before the
ALJ.

[5]At the time of the hearing before the ALJ on June 23, 2008,
Plaintiff had been separated from her husband for seven years and
she resided with her daughter and son who were 24 years and 18
years of age, respectively.  (R. 294).

advertising. She also held jobs as a cashier and cocktail
waitress/bartender.[6] (R. 64-65, 74).

Dr. Julia T. Mathos has been Plaintiff's primary care
physician since February 2002. (R. 204). The records of Dr.
Mathos in the administrative file, which cover the period
February 2002 through February 2008, show that she has treated
Plaintiff on a regular basis for various illnesses, including
fibromyalgia,[7] fatigue, depression,[8] cervical spasms, dizziness,
lumbar pain with radicular symptoms down the left leg, edema,
right foot pain, knee pain and arthritis. (R. 115-29, 183-261,

---

[6]Because Plaintiff has not worked since 1984, she is
considered to lack a relevant work history under the Social
Security Regulations. See 20 C.F.R. § 416.965(a)("We do not
usually consider that work you did 15 years or more before the
time we are deciding whether you are disabled applies.").

[7]Fibromyalgia is a common condition characterized by long-
term, body-wide pain and tender points in joints, muscles,
tendons and other soft tissues. Fibromyalgia has also been
linked to fatigue, morning stiffness, sleep problems, headaches,
numbness in hands and feet, depression and anxiety. The cause of
this disorder is unknown. Men and women of all ages get
fibromyalgia, but the disorder is most common among women aged 20
to 50. Diagnosis of fibromyalgia requires a history of 3 months
widespread pain, and pain and tenderness in at least 11 of 18
tender-point sites. These tender-point sites include fibrous
tissue or muscles of the arms (elbows), buttocks, chest, knees,
lower back, neck, rib cage, shoulders and thighs. Sometimes,
laboratory tests and x-rays are done to help confirm the
diagnosis by ruling out other conditions that may have similar
syptoms. www.nlm.nih.gov/medlineplus/encyclopedia (last visited
8/24/2009).

[8]With regard to depression, Plaintiff testified at the
hearing before the ALJ that she gets depressed because she is
sick. (R. 301).

4

295).   In addition, since January 11, 2006, Plaintiff has
received chiropractic treatment at the Irwin Family Chiropractic
Clinic for muscle spasms and pain on a weekly basis.[9]   (R. 130-
50, 276-84, 295).

In a Disability Report completed on August 1, 2007,
Plaintiff reported that she is unable to work due to
"Fibromyalgia, Severe Dizziness, Degenerative Arthritis in neck,
Arthritis in knees, Severe Headaches, Blinding Lights in eyes,
Brain Tumor"[10] and "chronic fatigue syndrome."   (R. 64).   At the
time of the hearing before the ALJ, Plaintiff was taking the
following medications: Effexor (fibromyalgia pain and
depression), Naproxen (arthritis pain), Furosemide ("water pill"
to reduce swelling and fluid retention), Flexeril (muscle
relaxant for pain) and magnesium (fibromyalgia pain).   Side

---

[9]The administrative file contains records of the Irwin
Family Chiropractic Clinic covering the period January 11, 2006
to July 25, 2008.

[10]With respect to Plaintiff's inclusion of a brain tumor
among her disabling conditions, the Court notes that she informed
Dr. Mathos during an office visit on March 22, 2002 that an MRI
four years earlier had revealed a tumor on her pineal gland, and
that Dr. Maroon whom she saw following the MRI stated that the
tumor was small and should not be a problem, although she should
have it checked regularly.   (R. 204).   In this connection, the
Court notes that a review of Plaintiff's administrative file
reveals no evidence of any problems resulting from the brain
tumor which would affect Plaintiff's ability to work.   Rather,
the basis for Plaintiff's claim of disability is the pain and
fatigue resulting from her fibromyalgia and arthritis.   (R. 313,
Document No. 11, p. 2).

5

effects from Plaintiff's medications included sleepiness and stomach upset.[11]   (R. 111, 295-96).

In addition to the records of Dr. Mathos and the Irwin Family Chiropractic Clinic, Plaintiff's administrative file contains the following evidence: (a) a report of an x-ray of Plaintiff's neck on November 5, 2003 which revealed early degenerative changes (R. 213); (b) a report of an x-ray of Plaintiff's lumbar spine on August 2, 2005 which showed moderately advanced discogenic disease and narrowing between L5/S1 (R. 210); (c) a report of a consultative examination of Plaintiff on October 6, 2007 by Dong W. Pae, M.D. (R. 151-57); (d) a Physical Residual Functional Capacity Assessment completed by a non-examining State agency medical consultant on October 9, 2007 (R. 96-102); (e) a Psychiatric Review Technique Form completed by a non-examining State agency psychological consultant on October 10, 2007 (R. 158-70); (f) a report of an x-ray of Plaintiff's left knee on December 7, 2007 which was normal (R. 206); (g) a report of an MRI of Plaintiff's left knee on December 14, 2007 which showed mild degenerative arthritic changes (R. 205); (h) Answers to Interrogatories directed to Dr.

---

[11]Regarding the impact of fibromyalgia on her life, Plaintiff testified at the hearing before the ALJ as follows: "Well, I have fibromyalgia, it effects a lot of things, it's just not pain, it's headaches, it's muscle spasms, it's neck spasms, it's, it, it touches everything, everything that you can think of it, it touches in my life. I can't stand long, I can't walk long, I can't sleep because of it." (R. 299).

6

Mathos dated February 8, 2008 (R. 262-70); (i) a report of a
Functional Capacity Evaluation performed by a physical therapist
on June 10, 2008 (R. 271-75); and (j) written statements by two
friends concerning the effect of Plaintiff's fibromyalgia on her
activities of daily living.[12]   (R. 112-13).

## IV.   **ALJ's Decision**

When presented with a claim for Social Security disability
benefits, an ALJ must follow a sequential evaluation process,[13]
which was described by the United States Supreme Court in
Sullivan v. Zebley, 493 U.S. 521 (1990), as follows:

                    *    *    *

   Pursuant to his statutory authority to implement the SSI
   Program, (footnote omitted) the Secretary has promulgated
   regulations creating a five-step test to determine whether
   an *adult* claimant is disabled.  See Bowen v. Yuckert, 482
   U.S. 137, 140-42 (1987). (footnote omitted).  The first two
   steps involve threshold determinations that the claimant is
   not presently working and has an impairment which is of the
   required duration and which significantly limits his ability
   to work.  See 20 C.F.R. §§ 416.920(a) through (c)(1989).  In
   the third step, the medical evidence of the claimant's
   impairment is compared to a list of impairments presumed
   severe enough to preclude any gainful work.  See 20 C.F.R.
   pt. 404, subpt. P, App. 1 (pt. A)(1989).  If the claimant's
   impairment matches or is "equal" to one of the listed
   impairments, he qualifies for benefits without further
   inquiry.  § 416.920(d).  If the claimant cannot qualify
   under the listings, the analysis proceeds to the fourth and

_____

[12]As noted earlier, Plaintiff's subjective complaints of
disabling pain and fatigue were also corroborated by her daughter
who testified at the hearing before the ALJ concerning the
limitations suffered by Plaintiff as a result of fibromyalgia.
(R. 314-16).

[13]*See* 20 C.F.R. § 416.920(a)(4).

7

fifth steps. At these steps, the inquiry is whether the claimant can do his own past work or any other work that exists in the national economy, in view of his age, education, and work experience. If the claimant cannot do his past work or other work, he qualifies for benefits. §§ 416.920(e) and (f).

\*   \*   \*

493 U.S. at 525-26.

With respect to the ALJ's application of the sequential evaluation process in the present case, steps one and two were resolved in Plaintiff's favor; that is, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the protective filing date of her application for SSI on July 16, 2007 and the medical evidence established that Plaintiff suffers from the severe impairments of obesity,[14] fibromyalgia, cervical and lumbar disc disease and a depressive disorder. (R. 14). Turning to step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or equaled the requirements of any impairment listed in Part 404, Subpart P, Appendix 1 of the Social Security Regulations. (R. 14-16). Prior to proceeding to step four, the ALJ assessed Plaintiff's RFC, concluding that Plaintiff retained the RFC to perform light work with the following limitations:[15] (a) no more than

---

[14]With respect to obesity, Plaintiff testified at the hearing before the ALJ that she had gained 80 pounds since she initially became sick in 1990. (R. 298).

[15]The Social Security Regulations define light work as follows: "Light work involves lifting no more than 20 pounds at a

8

occasional postural maneuvers such as stooping, kneeling, crouching, crawling and climbing of ramps, stairs, ladders, ropes or scaffolds; (b) no concentrated exposure to hot or cold temperature extremes or extreme dampness/humidity; (c) no exposure to dangerous machinery and unprotected heights; (d) no job requiring more than simple, routine, repetitive tasks; (e) no job involving a fast-paced production environment or more than simple, work-related decisions; and (f) a job with relatively few work place changes. (R. 16-20). As to step four, the ALJ noted that Plaintiff has no past relevant work history. (R. 20). Finally, at step five, based on the VE's testimony, the ALJ found that considering Plaintiff's age, education, work experience and RFC, there were a significant number of jobs in the national economy which Plaintiff could perform, including the light exertion jobs of a bakery wrapper, a small parts assembler and a cashier/toll collector. (R. 20-21, 318).

---

time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. 416.967(b).

9

## V. Legal Analysis

### Fibromyalgia

In Sarchet v. Chater, 78 F.3d 305 (7th Cir.1996), a social
security claimant sought review of the Commissioner's decision to
deny disability benefits for fibromyalgia. The district court
entered judgment for the Commissioner, and the claimant appealed.
The Court of Appeals for the Seventh Circuit reversed and
remanded, holding that the denial of disability benefits was
improper. With respect to the unique nature of disability claims
based on fibromyalgia, the Court of Appeals stated:

\* \* \*

Marlin Sarchet was denied social security disability
benefits, challenged the denial in the district court, lost,
appeals. She is 42 years old, with a graduate equivalency
degree, but she has not worked since 1978. She claims that
in 1990 she became totally disabled as a consequence of
fibromyalgia, also known as fibrositis - a common, but
elusive and mysterious, disease, much like chronic fatigue
syndrome, with which it shares a number of features.
(citations omitted). Its cause or causes are unknown, there
is no cure, and, of greatest importance to disability law,
its symptoms are entirely subjective. There are no
laboratory tests for the presence or severity of
fibromyalgia. The principal symptoms are "pain all over,"
fatigue, disturbed sleep, stiffness, and - the only symptom
that discriminates between it and other diseases of a
rheumatic character - multiple tender spots, more precisely
18 fixed locations on the body (and the rule of thumb is
that the patient must have at least 11 of them to be
diagnosed as having fibromyalgia) that when pressed firmly
cause the patient to flinch. All of these symptoms are easy
to fake, although few applicants for disability benefits may
yet be aware of the specific locations that if palpated will
cause the patient who really has fibromyalgia to flinch.
There is no serious doubt that Sarchet is afflicted with the
disease but it is difficult to determine the severity of her

10

>        condition because of the unavailability of objective
>        clinical tests.   Some people may have such a severe case of
>        fibromyalgia as to be totally disabled from working,
>        (citations omitted), but most do not and the question is
>        whether Sarchet is one of the minority.

*        *        *

778 F.3d at 306-07.[16]

Plaintiff maintains that, like the ALJ in <u>Sarchet</u>, the ALJ in the

present case erred in finding that she was not disabled by

fibromyalgia based on the lack of objective medical evidence and

aggressive treatment to support her claim of disabling pain.

(Document No. 11, p. 12).   The Court agrees.

In four separate sections of her decision (*i.e.*, in

determining that Plaintiff did not meet a listed impairment (R.

15), in finding that Plaintiff retained the RFC for light work

(R. 17), in finding that Plaintiff's statements and testimony

with respect to disabling pain were not entirely credible (R.

18), and in declining to adopt or give "even great weight" to the

opinions of Dr. Mathos, Plaintiff's PCP who has treated her on a

regular basis since 2002, and Dr. Pae, the consultative examiner,

regarding Plaintiff's functional limitations from fibromyalgia

(R. 19)), the ALJ cited the following evidence as support for

_____

[16]<u>See also</u> <u>Preston v. Sec'y of Health and Human Servs.</u>, 854
F.2d 815, 819 (6th Cir.1988)("Our task in reviewing [the
claimant's onset date of disability] is complicated by the very
nature of fibrositis.   Unlike most diseases that can be confirmed
or diagnosed by objective medical tests, fibrositis can only be
diagnosed by elimination of other medical conditions which may
manifest fibrositis-like symptoms of musculoskeletal pain,
stiffness, and fatigue.").

11

these decisions: (1) the diagnostic studies of Plaintiff's cervical and lumbar spines revealed evidence of only moderate osteoarthritic/degenerative changes with no evidence of frank disc herniation, spinal stenosis, nerve root impingement or arachnoiditis; (2) Plaintiff's physical examination during the consultative examination performed by Dr. Pae in October 2007 revealed full range of motion of the cervical and lumbar spines, shoulders, elbows, wrists, knees, hips and ankles with no joint deformities, a normal gait, normal grip strength and no atrophy; and (3) Plaintiff's physical examination by Dr. Mathos in February 2008 revealed 5+/5 strength in all extremities, intact sensation to pinprick and equal deep tendon reflexes bilaterally.

Clearly, the foregoing evidence is of little relevance in reviewing a claim of disability based on chronic pain and fatigue from fibromyalgia and does not constitute substantial evidence supporting the ALJ's denial of Plaintiff's claim for SSI. As noted by Plaintiff, "[w]hile this analysis convincingly demonstrates that [she] does not have a disabling *orthopedic* impairment, it is not in any way germane to the question of whether her fibromyalgia allows her to work on a regular and continuous basis." (Document No. 11, p. 15).

Similarly, in three separate sections of her decision (*i.e.*, in finding that Plaintiff retained the RFC for light work (R. 17), in finding that Plaintiff's statements and testimony with

12

respect to disabling pain were not entirely credible (R. 18), and in declining to adopt or give "even great weight" to the opinions of Drs. Mathos and Pae regarding Plaintiff's functional limitations from fibromyalgia pain and fatigue (R. 20)), the ALJ stated that Plaintiff has not required "aggressive medical treatment, frequent inpatient hospital confinement/emergency room care, or surgical intervention." The Court can find no support for the ALJ's apparent belief that aggressive treatment, including frequent hospitalizations, ER visits and surgeries, are appropriate treatment modalities for a patient suffering from chronic fibromyalgia pain and fatigue. Thus, their absence from the record is not substantial evidence supporting the ALJ's decision to deny Plaintiff's claim for SSI.[17]

With respect to the proper analysis of disability claims based on fibromyalgia, as noted by Plaintiff, the ALJ also erred by failing to address clinical findings of Dr. Mathos during Plaintiff's numerous office visits which support her claim of disabling fibromyalgia pain and fatigue.[18] (Document No. 11, pp.

---

[17]With respect to treatment, the Court also notes that the ALJ's decision fails to mention Plaintiff's weekly chiropractic treatments since January 2006 to control her chronic pain and muscle spasms.

[18]For example, on October 30, 2003, Dr. Mathos noted that Plaintiff was being seen primarily for her fibromyalgia symptoms; that Plaintiff sees a chiropractor regularly for treatment of her fibromyalgia; and that plaintiff's physical examination showed "positive trigger point pain." (R. 201). On December 5, 2003, Dr. Mathos noted that Plaintiff "still has a lot of body aches

13

15-16). See Cotter v. Harris, 642 F.2d 700 (3d Cir.1981)(Held:
ruling that claimant who sought disability benefits was not
disabled was required to be vacated when ALJ failed to explain
his implicit rejection of evidence which supported the claim or
even to acknowledge presence of such evidence). On remand, Dr.
Mathos's clinical findings relating to fibromyalgia should be
included in the analysis of Plaintiff's claim for disability
benefits.

_____

and fatigue." (R. 200). On February 13, 2004, Dr. Mathos noted
that Plaintiff complained of more achiness and her physical
examination revealed "positive trigger points consistent with the
fibromyalgia." (R. 200). On May 14, 2004, during a follow-up
visit for fibromyalgia and depression, Dr. Mathos noted that
Plaintiff "still has a lot of pain in her muscles and spasms."
(R. 199). On December 8, 2004, Dr. Mathos noted that although
Plaintiff reported less fibromyalgia pain on Effexor, she
"definitely is not sleeping much" and receives trigger point
massage from the chiropractor. (R. 198). On October 2, 2007,
Dr. Mathos noted that Plaintiff gets only 1 to 4 hours of sleep a
day; that Plaintiff suffers from "persistent myalgia better since
on Effexor but still spends most days doing very little if sits
up too long or does any extra work states she is down for several
days sees chiro weekly;" and that Plaintiff's musculoskeletal
examination revealed palpable spasm in her cervical musculature,
normal range of motion but with pain and positive trigger points
for fibromyalgia in her cervical spine and upper thoracic area.
(R. 192-94). Finally, on February 1, 2008, Dr. Mathos noted that
Plaintiff continued to get only 1 to 4 hours of sleep per day;
that Plaintiff sees a chiropractor on a weekly basis for
treatment to her upper back and to prevent muscle spasms; and
that Plaintiff's musculoskeletal examination revealed palpable
spasm in her cervical musculature, normal range of motion but
with pain, positive trigger points for fibromyalgia in her
cervical spine and upper thoracic area, difficulty squatting,
pain with forward bending in her low back and thighs and pain in
her legs while heel/toe walking. (R. 186).

14

**Erroneous Findings by the ALJ**

A review of the ALJ's adverse decision shows that the ALJ made two clearly erroneous findings relating to Plaintiff's credibility which need to be addressed on remand. First, the ALJ found that Plaintiff's self-reported activities of daily living are inconsistent with an individual experiencing totally debilitating symptoms. In support of this finding, the ALJ relied on Exhibit 5E and Plaintiff's hearing testimony, stating that "she is able to care for her personal needs independently, watch television, drive short distances and perform various household chores such as preparing meals, washing dishes, doing laundry and grocery shopping." (R. 18). A review of Exhibit 5E, which is a Function Report completed by Plaintiff on August 30, 2007, and Plaintiff's hearing testimony reveals that the ALJ grossly distorted Plaintiff's self-reported daily activities.

Contrary to the ALJ's description of Plaintiff's self-reported daily activities, in Exhibit 5E, Plaintiff actually reported that her children do a lot of the housework; she is unable to bathe at times due to pain and dizziness; her children help with cooking and she is required at times to sit in a chair to cook; although she can do laundry at times, she has to sit to fold the laundry and rest between loads; she keeps up her driver's license but rarely drives; she goes grocery shopping once a month with her daughter, who finishes the shopping when

15

she has to go to the car to sit and rest; and she rarely leaves her house.[19] (R. 88-95).

Similarly, during the hearing before the ALJ, Plaintiff testified that her daughter drove her to the hearing; she generally does not drive because she is afraid she will get sick while driving; the drive to the hearing, which was a little over an hour, made her ill; she cannot stand or walk for long periods of time (more than 10 and 3 minutes, respectively); she cannot sleep; she sometimes needs to sit to do the dishes; she does not get dressed "most days" because she does not go anywhere; her ability to lift is limited to a gallon of milk; she had not gone grocery shopping in a few months because "we would have a cart half full and then I would get a dizzy spell and we'd have to leave the groceries and they'd have to get me out to the car and it was just not worth me going anymore;" she does the dishes, however, she may be need to sit in a chair to do them; she can fold "little things" with regard to laundry; she does not sweep due to neck pain; she does not engage in any social activities

---

[19]On the first page of the Function Report, Plaintiff was asked to describe what she does from the time she wakes up until going to bed. She responded as follows: "Not a lot. I get up, sit for awhile in my kitchen. If I can that day I do some laundry. If not I go lay on my couch. Usually don't go anywhere. Eat what my daughter cooks, rest more, watch TV. Then try to sleep. That's my life basically. In between these I cry a lot." (R. 88). This description contrasts sharply with the ALJ's characterization of Plaintiff's self-reported daily activities.

16

outside her home or go to restaurants; she cannot shower on some days due to dizziness or exhaustion; and she cannot read newspapers or other items because she gets bad headaches and sees bright lights.[20]   (R. 298-300, 302-04, 306).

With respect to the ALJ's finding that Plaintiff's self-reported activities of daily living were inconsistent with her allegations of disabling pain and fatigue, and, therefore, undermined her credibility, the Court also notes that Plaintiff's description of her daily activities was corroborated by her daughter during the hearing before the ALJ and by two friends who submitted statements concerning the effects of Plaintiff's fibromyalgia on her life. (R. 112-13, 314-16). In fact, the Court can find no evidence in the record to contradict Plaintiff's description of her daily activities.

The second error made by the ALJ in assessing the credibility of Plaintiff's allegations of disabling fibromyalgia pain and fatigue involves medications and side effects. In this regard, the ALJ stated:

"Although the claimant reported that she experiences various side effects from her medications, including nausea and drowsiness, there is no evidence that the claimant has reported experiencing significant side effects from her medications to any medical source of record or that her

---

[20]At the hearing, Plaintiff was asked to describe a typical day. Her response was substantially similar to the response she gave to this question in the Function Report, see footnote 19. (R. 306).

medications have been frequently changed or the dosages
altered due to side effects and/or ineffectiveness."

(R. 18).

This statement is simply wrong.

The records of Dr. Mathos reflect numerous complaints of
medication side effects by Plaintiff, as well as frequent
medication changes in an attempt to alleviate Plaintiff's
fibromyalgia symptoms.  See R. 202 ("The only thing she takes is
Naprosyn p.r.n.  She has not been able to tolerate the other
medications as she gets drowsy and woozy"), R. 201 ("She has been
tried on several antidepressants, including Paxil, Zoloft, Celexa
and Effexor, and did not like how she felt on those."  ... "She
has been given muscle relaxants in the past. Some of them made
her groggy." ..."Will also give her a trial of Lexapro" ... "If
she has a problem with Lexapro she will discontinue it"), R. 200
("We will try Effexor XR 37.5 mg. 1 q.d. for 1 week and increase
to 75."), R. 199 ("She stopped taking the Effexor; she had some
mild dreams with it and did not tolerate it.  She would like to
go back on Lexapro...."), R. 199 ("She did finally start the
Lexapro.  She is not having any side effects from it, but she
does not feel that it really is helping much."), R. 198
("Discussed with her trying to change her Effexor to 37.5 mg
around since she could not tolerate 75 mg because she got too
drowsy but she is taking it in the daytime.  Slowly change to
37.5 mg in the evening.  Recheck in 3 weeks.  Will reevaluate to

see if we can increase her Effexor if she needs it for myalgia."), R. 198 ("We are trying to increase the Effexor slowly to 75 or possible 112 since she might be able to tolerate that slowly. She will call with her progress...."), R. 196 ("... she feels the Effexor may need to be increased." ... "Will increase [Effexor] to 150 mg.").

Based on the foregoing erroneous findings of the ALJ concerning Plaintiff's activities of daily living and medications, a further assessment of Plaintiff's credibility is required on remand.

## **Weight Accorded Opinion Evidence**

It is well established that an ALJ should give a treating physician's report great weight in a social security disability case, especially when his or her opinion reflects expert judgment based on continuing observation of a patient's condition over a prolonged period of time. See, e.g., Brownawell v. Comm'r of Social Security, 554 F.3d 352, 355 (3d Cir.2008).

Based on the ALJ's failure to properly evaluate Plaintiff's claim of disability due to fibromyalgia, as well as the erroneous findings made by the ALJ with respect to the credibility of Plaintiff's allegations of disabling fibromyalgia pain and fatigue, on remand, the ALJ also will need to reassess the weight to which the opinion of Dr. Mathos, Plaintiff's long-time PCP, is entitled. In her decision, the ALJ declined to adopt or "even

19

give[] great weight" to Dr. Mathos's assessment of Plaintiff's RFC, as well as the RFC assessment of Dr. Pae, the consultative examiner, because they "appear to be based in large part, if not entirely, on the claimant's subjective allegations." (R. 19). In light of the nature of fibromyalgia, the ALJ's stated reason for rejecting the opinions of Drs. Mathos and Pae regarding Plaintiff's RFC was erroneous.

## Hypothetical Question to VE

Finally, as noted by Plaintiff, an issue exists as to whether she retains the RFC to perform substantial gainful activity on a regular and continuing basis, *i.e.*, 8 hours a day, 5 days a week, see Social Security Ruling 96-8p, and the only evidence on this issue was provided by Dr. Mathos in her answers to interrogatories. (Document No. 11, p. 19). Specifically, Dr. Mathos opined that due to fibromyalgia, Plaintiff's ability to engage in physical work-related activities varies from day to day; that within a reasonable degree of medical certainty, Plaintiff would most likely be unable to work an 8-hour workday with only 3 breaks (according to the VE, it is customary for an employer to provide an employer with 3 breaks during the workday (R. 319)); that Plaintiff would be unable to concentrate on her work at any job at least 75% of the work day due to pain (according to the VE, an employee would not be able to maintain competitive employment if he or she could not stay on task 90% of

20

the time (R. 319-20)); and that Plaintiff would not be able to
work at any job for 8 hours a day due to fatigue from lack of
adequate sleep.  (R. 262-70).  Despite this uncontradicted
evidence concerning Plaintiff's inability to engage in
substantial gainful activity on a regular and continuing basis,
the ALJ failed to include these limitations in the hypothetical
question posed to the VE.  Therefore, the VE's response to the
ALJ's hypothetical question does not constitute substantial
evidence supporting the ALJ's determination that Plaintiff
retained the RFC to perform a significant range of light work.
See, e.g., Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d
Cir.1987)(A hypothetical question must reflect all of a
claimant's impairments that are supported by the record;
otherwise, the question is deficient and the expert's answer to
it cannot be considered substantial evidence).  Under the
circumstances, on remand, the testimony of another VE is needed.

**VI. Conclusion**

In sum, on remand, the ALJ is directed to engage in a
further analysis of Plaintiff's claim of disability based on
fibromyalgia pain and fatigue, including her RFC, her
credibility, and the weight to which the opinions of Drs. Mathos
and Pae concerning Plaintiff's functional limitations are
entitled.  In addition, the ALJ is directed to obtain additional
VE testimony based on a hypothetical question that includes all

21

of the work-related limitations resulting from Plaintiff's

fibromyalgia pain and fatigue that are supported by the record.

William L. Standish
United States District Judge

Date: August **3/** 2009